[Civil No. 2763.   Filed October 14, 1929.]

[281 Pac. 202.]

BURT  W.  HOLDRIDGE,  Appellant,  v.  SOUTH-
WEST  COTTON  COMPANY,  a  Corporation,
Appellee.

See  Attorney  and  Client,  6  C.  J.,  sec.  211,  p.  686,  n.  20,  p.  687,
n.  23.
Guaranty,  28  C.  J.,  sec.  49,  p.  917,  n.  42.

Mr. G. P. Nevitt, for Appellant.

Mr. James R. Moore and Mr. Harlow H. Akers, for Appellee.

ROSS, J.—This is an action for damages for breach of contract. Holdridge is only the nominal plaintiff, the real plaintiff being G. P. Nevitt, who, during all the times herein referred to, was the attorney for the defendant-appellee. He is not suing for professional services, however, but for $90,000 damages he alleges he sustained by reason of defendant's failure to accept and pay for, upon tender, in accordance with its agreement, certain Pima cotton crops grown by him in the Salt River Valley during the season of 1920-21.

The defendant's answer, among other defenses, raised the question of the right of plaintiff as the attorney for defendant to enter into the alleged contract with defendant, also pleaded a failure or want of consideration, also denied that the minds of plaintiff and defendant met so as to form a contract of purchase and sale, as alleged.

The case was tried by the court with a jury, and at the close thereof, upon a motion by defendant alleging fourteen different grounds therefor, the court instructed the jury to return a verdict for the defendant.

We do not know, as the court did not state, upon which of the numerous grounds of the motion for an instructed verdict the motion was granted. Plaintiff has therefore stated his assignments so as to require us to look into the fourteen grounds of the motion to

determine if the court's instruction to the jury was justified upon any of the grounds specified.

Of course it was necessary to a valid binding contract that the minds of the parties meet and that a consideration be given or exchanged, and, in addition thereto, the contract being between attorney and client, it must appear to have been entered into after a full and complete disclosure by the attorney to the client. In other words, it must appear that the plaintiff did not take advantage of the confidential relation existing between him and the defendant to secure a contract more favorable than he would have approved between his client and a stranger.

It appears that the Southwest Cotton Company was a subsidiary of the Goodyear Tire & Rubber Company and was organized by the latter to engage in growing, and encouraging others to grow, long staple cotton to be used in the manufacture of rubber tires for automobiles, and that it confined its operations principally to Arizona and California. It had acquired in the Salt River Valley large acreage of its own, on which it had grown Pima long staple cotton for some three or four years prior to 1920, and during said time had bought much cotton from other growers in the Salt River Valley, Yuma Valley, Imperial Valley, and elsewhere. In 1920 it owned several gins, located in different parts of Arizona and California, with large capacity; also an oil mill, warehouses, etc., in the Salt River Valley. In that year it was directly farming approximately 25,000 acres of its own and "financing" a very much larger acreage, by which we understand the defendant advanced all necessary seed, taking the grower's note therefor bearing interest at six per cent and the grower's agreement incorporated in the note to sell cotton to defendant. In other words, defendant was a large concern doing millions of dollars of business. It had its field department, its executive department, and its legal

department, over the latter of which, at least in the Salt River Valley, plaintiff had complete charge. It was his duty to advise defendant of its legal rights and duties—certainly it was his duty to furnish con‧ tracts and contract forms to be used by the company in the purchase of cotton from the grower and to advise the company of its rights therein.

The defendant's general manager was one E. F. Parker. He was also its vice-president and one of its directors. He had charge of the defendant's operations from the beginning, at the time of the alleged contract, June 2d, 1920, and until November 1st, 1921. He secured plaintiff's appointment as attorney for defendant very soon after the defendant began operations in Arizona. He and plaintiff had been classmates in the law department at Ann Arbor, graduated there together, were close warm friends then and subsequently, up to the time Parker called plaintiff to be the company's attorney, and at least to the time when plaintiff began insisting he had a contract with the defendant and urging Parker to take his side in this litigation.

The contract sued upon consists of a penciled memorandum upon "Inter-Dept. & Inter-Office Form Southwest Cotton Company," and was written by Parker on June 2d, 1920, upon his return from Honolulu, where he had been for about a month, and is as follows:

"To G. P. N.
     "From Office ——: Date June 2, —20.
               "Subject 75¢ Guarantee
  "As F. A. S. and I suspected, 75¢ Marinette guarantee doesn't seem to stay secret. Will treat SWCCo tenants on same basis—Herewith decision.
  "Southwest Cotton Co. agrees:
  "1) To purchase whenever offered for sale, all Pima lint cotton grown by you in SRValley during 1920–21 season at market price prevailing in said valley.

"2) That prevailing market price all lint cotton grown by you Wilbur Ranch shall be not less than 75¢ lb. basis extra. For all other cotton grown by you in SRV on lands not leased from Co price be not less than 60¢ lb. same basis.

"3) If *bona fide* offer made you higher than SVR market, you give SWCCo option to purchase at price offered.

"You agree

"1) To sell all lint cotton as per par 1 above.

"2) Give option as per par 3 above.

"3) You to select time when you desire to sell.

"I believe above is substantially terms existing Imperial-Yuma contracts. No use further discussion 75¢ guarantee as extension of same beyond treating SWC tenants alike never contemplated by F. A. S. and me. Your contention illogical. Accept above terms or nothing. Atha is right—these guarantees are 'good insurance.'

"As to Montgomery, Hudson, Pac Cotton Co and others mentioned by you, offer same terms as above except not being tenants, 60¢ guarantee only. Prepare formal contracts yourself & for valley generally. Will handle other tenants when I return. Dr. Chandler deal coming up soon. Push Atha matter & gov. bonded warehouse. Herewith copy letter referring Worcester. Believe you knew him. Return for my files.                                    E. F. P."

About June 17th, 1920, Nevitt placed the following pencil indorsement on the bottom of Parker's memorandum and mailed it to him at Los Angeles: "E. F. P.

"Terms above accepted for self and others. 'That or nothing' doesn't sound like you— Why so d—— cross and dictatorial.

                                    "G. P. NEVITT."

It is insisted by defendant that the language used in the above memorandum and the relations of the parties all evidenced an intention on the part of the defendant that there would be no completed contract until plaintiff had drafted the formal contract and

both parties had executed it. On the part of the plaintiff, it is insisted that the memorandum contained all the terms and conditions of the proposed contract, and that upon his acceptance of it by indorsement thereon it became a completed contract.

We have carefully looked into the law and have become convinced it is a very close question, so close indeed that we prefer not to decide the case upon this point. If the negotiations had been between the defendant and a stranger, the proposition would not be fraught with so much doubt. In such circumstances there would be, in the language of the law, "a dealing at arm's length." The plaintiff in the matter of his contract, as also formal contracts for the "valley generally," was under legal obligation to advise the defendant and its officers. There existed a fiduciary relation, and under such circumstances, even though the memorandum contained fully the terms and conditions of the contract, it was no doubt the company's right, and perhaps its duty, to require the execution of the formal contract before becoming bound. Expressing our doubt as to whether there was sufficient mutuality to constitute a contract, we will assume for the present that the defendant intended to bind itself and that the formal contract therein suggested was only intended as a memorial of this understanding.

We pass from this question to that of consideration. On June 2d, 1920, the date of the contract sued on, plaintiff's cotton crops were in the ground and had been for some time. In March of that year the defendant inserted in the Phoenix newspapers an offer to guarantee to its Salt River Valley customers a minimum of 60 cents basis for long staple cotton and the market for lint and seed. In such advertisement was this further offer. "We finance at 6% interest. Field service free. Crop financing contracts can be secured from the Cotton Purchase De-

partment.'' The finance feature of this offer was later taken advantage of by the plaintiff, but there is no contention that the defendant's newspaper offer of 60 cents for long staple was accepted by the plaintiff or that the alleged contract of June 2d, 1920, grew out of such offer.

One ranch of 501 acres (the Wilbur ranch) plaintiff subleased from one Zellner, who was a tenant of the defendant. In the Zellner lease from the defendant he agreed to plant long staple Egyptian cotton in 1920 upon all of the tillable land of the Wilbur ranch, and therein gave the following option to the defendant:

''The lessor shall have the privilege of purchasing said cotton crop and its products at the market price. The lessee, however, reserves the right to select the date from time to time when he will desire to sell the products of the said cotton crop and if on any date so selected, the lessor does not wish to purchase any part or all of the products which the lessee then desires to sell at the then market price of such products, then and in that event, the lessee may sell the products of the said cotton crop to any person or persons whomsoever.''

In January, 1920, this lease, with the consent of the defendant, was assigned by Zellner to plaintiff, who thereupon executed the following indorsement and agreement on said lease:

''I, G. P. Nevitt, in consideration of the above assignment, and in consideration of the consent of the Southwest Cotton Company thereto, hereby assume and agree to pay all rent due as mentioned under and by virtue of the terms of the said sub-lease; and I further agree to keep and perform all the covenants, agreements and conditions of the said lease on the part of the lessee to be kept and performed.''

Zellner looked after the planting and cultivating of the Wilbur ranch under an arrangement between him and plaintiff that plaintiff contends made him a

"cropper" and defendant contends constituted a partnership.

The cotton on three other ranches is also claimed to be covered by the contract. The plaintiff took a lease of the Dorris ranch of 310 acres in December, 1919, under an arrangement or agreement with T. O. Carter and W. H. Nall that they together would cultivate it in cotton during the 1920 season. As to the relation of these parties to the plaintiff, contentions similar to those in the Wilbur case are made. The Chaffee ranch of 80 acres was planted and cultivated under similar arrangement between plaintiff and Carter and Nall, it appearing that of the rent for this place for the year Nall paid a thousand dollars. The plaintiff purchased the crop growing on the Storey ranch of 40 acres on the first day of June, 1920, and the crop was thereafter cared for and cultivated by Carter and Nall under an arrangement similar to that governing in the matter of the Dorris and Chaffee ranches. During the planting season, Zellner and Nevitt, transacting business under the name of Zellner & Nevitt, and Nevitt, Nall, and Carter, transacting business in the name of Nevitt & Nall, and Nall & Carter, bought long staple cotton seed from defendant and gave their respective promissory notes, in the names as above indicated, bearing interest at six per cent, for the various lots of seed bought. The Zellner & Nevitt notes were executed by Zellner, while the Nall & Carter notes and Nevitt & Nall notes were executed by Nall. Each of these notes contained the following option to the defendant to purchase all cotton and its products which the maker might raise or grow during the season of 1920:

"In further consideration of the above mentioned loan, the undersigned agrees to deliver all cotton and its products which he may grow, harvest and mature during the crop season of 1920 to the Southwest Cot-

ton Company at one of its various gins located in and around the Salt River Valley, said cotton and its products to be ginned and baled by the said the Southwest Cotton Company. The undersigned further gives to the Southwest Cotton Company, the option or privilege of purchasing any and all cotton and its products which the undersigned may raise or grow during the season of 1920. The undersigned, however, reserves the right to select a date from time to time when he desires to sell the products of the said crop. Should the Southwest Cotton Company not desire to purchase the cotton and its products or any part thereof on the day so chosen by the undersigned, then the undersigned may sell the cotton and its products to any person or persons who desire to purchase the same.''

At the time Nevitt purchased the growing crop on the Storey ranch the defendant had a mortgage thereon for the sum of $300. The mortgage gave the defendant an option to buy the cotton grown on the Storey ranch at the market when offered for sale by the mortgagor. Plaintiff assumed and agreed to pay the mortgage and knew at the time that it carried an option on the cotton in favor of the defendant.

Under the terms of the Wilbur ranch lease the defendant, on June 2d, 1920, the date of the alleged contract sued on, had an option on all of the products, at the market price, grown thereon during the season of 1920 and 1921. If the notes given for seed planted on the Dorris and Chaffee ranches were the notes of plaintiff, a like option existed for the products of these ranches. A careful reading of the record convinces us that such notes were made with the plaintiff's knowledge and consent. The plaintiff himself used the firm names of Zellner & Nevitt and Nevitt & Nall in different ways. He signed these names to notes given to banks for the purpose of borrowing money. Accounts at the banks were carried in these names. ''Nevitt & Nall'' was

printed on checks used by this name. Warehouse receipts were issued to Zellner & Nevitt and to Nevitt & Nall. These seed notes were later acknowledged and paid by plaintiff, as shown by his testimony in another case wherein he testified:

"Well, Mr. Metzler said he would agree to do that, and we then agreed he would apply the $2505.25 against some of the promissory notes which I had signed and executed to the Southwest Cotton Company on account of delivery of seed."

In view of these facts, we do not think it material to determine whether Nevitt and his farmers were in fact partners or their relation was that of master and servant. It might be in a dispute between him and his farmers the law would hold the latter as mere croppers, but, as to the general public, because of their holding themselves out as partners, a very different rule would be applied.

Plaintiff, however, says that under the law the option contained in such notes is void for failure to fix the price of products or provide a way in which a price could be fixed. We think the contract does indicate a way or method by which the price could be ascertained. In permitting the seller to select the date, the contract in effect stipulates the market price on that date as the price to be paid. However, whatever the rule may be in other jurisdictions, we think, in accordance with our decision in *Hall* v. *Weatherford,* 32 Ariz. 370, 56 A. L. R. 903, 259 Pac. 282, the court would read into the seed notes an agreement to pay a reasonable price, which would be the market price on the date the seller selected for the sale. It appears from plaintiff's testimony that he as the attorney for the defendant drafted the form of these seed notes and that he was instructed to insert in them an option to defendant to purchase the cotton products grown by the makers. Even though it

should turn out that the option he thus drew was void for uncertainty for failure to fix a price, or method to determine the price we think he should not be permitted to take advantage of the situation. If this option be held void as between the company and strangers, from no standpoint should it be held to be void as between the company and the plaintiff. It being his duty to write a legal and enforceable option, the very just and equitable rule of estoppel would prevent his taking advantage of it.

These option contracts of June 2d were bilateral. The defendant had paid considerations for them so that plaintiff could not at his pleasure withdraw his offer. He was bound to sell, or to offer to sell, his cotton products grown on the Wilbur, Dorris, Chaffee and Storey ranches during 1920–21 to the defendant at the market price.

"The rule is that, while a contract remains executory on both sides, an agreement to annul on one side is a consideration for the agreement to annul on the other, but that, if the contract has been executed on one side, an agreement without a new consideration that it shall not be binding is without consideration and void. The rule is well stated in 9 Cyc., p. 593, as follows:

" 'While a contract remains executory on both sides, an agreement to annul on one side is a consideration for the agreement to annul on the other, and *vice versa*. On the other hand, if the contract has been executed on one side, an agreement without any new consideration that it shall not be binding is without consideration and void.'

"This rule finds support in many adjudicated cases, only a few of which will be here assembled. *Wilson* v. *Wilson*, 115 Mo. App. 641, 92 S. W. 145; *George* v. *Lane*, 80 Kan. 94, 102 Pac. 55; *Zerr* v. *Klug*, 121 Mo. App. 286, 98 S. W. 822; *Weed* v. *Spears*, 193 N. Y. 289, 86 N. E. 10." *Tacoma & Eastern Lumber Co.* v. *A. B. Field & Co.*, 100 Wash. 79, 170 Pac. 360, 362.

That being true, what was the consideration moving to defendant for a guaranty to plaintiff of a minimum price of 60 cents and 75 cents per pound for the identical cotton? We can find nowhere in the record an independent consideration for the defendant's assumption of this extraordinary burden.

The circumstances of this case are unusual and peculiar. We have already indicated some of the facts making it so. Its basis is a contract between client and attorney, the .client being a corporation which can speak and act only through its officers. The contract alleged is informal, consisting of an offer penciled on a piece of inter-office paper by defendant's general manager and sent through the mails to plaintiff, who says he indorsed thereon his acceptance within three or four days of its receipt and remailed it to defendant's general manager without any accompanying letter. In other words, he kept no record of the contents of this memorandum or the wording of his acceptance thereon. The whole case as to the genuineness of this writing comes from the lips of the plaintiff. Parker, who represented defendant in whatever was done or said, although present at the trial and a classmate and warm personal friend of plaintiff, was not asked to give his version of such memorandum. Plaintiff testified that Parker denied from the very beginning that defendant had agreed to buy his cotton on the terms alleged, or at all; that he said, if plaintiff's acceptance was as plaintiff claimed, defendant was bound, but that he did not remember seeing on the offer any acceptance or an acceptance such as plaintiff claimed; that Parker could not find, and that plaintiff could not find, although a thorough search was made therefor, the memorandum of June 2d during 1920 and 1921 and, indeed, not until October, 1922, more than two years after its date and about one year after Parker's discharge, which was in November, 1921.

Plaintiff further testified that he accidentally found the memorandum in October, 1922, while still in defendant's employment, in the files of the president of the defendant and Goodyear Tire & Rubber Company; that he took the liberty of extracting it from such files and thereafter kept it in his possession; that he was discharged by defendant early in 1924, and in July of that year first made formal demand of defendant for damages and filed the suit thereon on October 13th, 1927. Plaintiff claims he pressed Parker during the season of 1920–21 to accept cotton and pay for it; that he offered to tender the cotton to the defendant, but Parker denied the existence of the contract; says the matter was not formally presented to defendant during such season or while Parker was still an officer of defendant because Parker insisted to do so would result in his and plaintiff's being discharged from their positions; that he desisted from presenting his claim until 1924 because he feared if he did so while he was defendant's attorney defendant would discharge him.

If the contract was a fair one to the defendant, why this hesitancy to let the responsible heads of the defendant know about it? Why any fear? It will be seen that it was through the confidential and trust relations existing between the defendant and plaintiff that he was able to get hold of said memorandum. No stranger to the defendant could have had access to its files and papers that plaintiff's employment gave him. He states that he wrote on the memorandum his acceptance before it was returned to Parker. Granting to this statement absolute verity, it must be apparent that he had opportunity after he extracted it from the files of the defendant to place thereon his acceptance. We do not say that he did such a thing. On the contrary, we accept his statement as true, but it illustrates the opportunity

his employment gave to alter or change or modify the memorandum or make it show for the first time an acceptance.

We also think that the facts show that plaintiff, because of his relation to the defendant, sought and received more favorable consideration than he would have received as a stranger. It will be noted the memorandum purports to guarantee plaintiff 75 cents per pound for long staple cotton grown by him as a *tenant* of the defendant.

In the spring of 1920, and after the planting season for cotton was passed, the defendant purchased of one Davie the Marinette ranch consisting of several thousand acres of land near Peoria, Maricopa county, and at the time of said purchase there were some twelve or fifteen of the tenants of Davie who had already planted long staple cotton. Part of the consideration for the conveyance of said land by Davie to the defendant was the promise and agreement of the defendant to guarantee such tenants a minimum of 75 cents per pound for the cotton then growing on the premises. It will be noted that the agreement of the defendant to guarantee 75 cents per pound to the tenants of the Davie tract was a part of the consideration for such conveyance. Plaintiff as the attorney for the defendant knew this, but, notwithstanding, because he was a tenant of defendant, he insisted he was in the same category as the Davie tenants, and therefore entitled to a guaranty of 75 cents per pound for all cotton grown by him as such tenant. The record does not show that any other tenant received the same favorable consideration.

In the case of *Southwest Cotton Co.* v. *Valley Bank et al.*, 26 Ariz. 559, 227 Pac. 986, the defendant herein was seeking to enforce a landlord's lien for rent against the cotton grown by present plaintiff (Nevitt) upon the Wilbur ranch, to which it was

clearly entitled unless for some reason or other it had waived or forfeited such lien. It appears in the report of that case that, because the defendant herein (the plaintiff therein) had turned over the warehouse receipts to its attorney, Nevitt, to be pledged by him to the Valley Bank for borrowed money, the landlord's lien was denied—a favor that no stranger could have received.

It may be possible that an attorney can deal with his client and observe the disinterested and impartial attitude that he would with a stranger, but, when such dealings become involved in litigation between him and his client, it is up to him to show that he has not taken advantage of or in any way over-reached his client. The facts and circumstances developed in this case require, we think, the rejection of plaintiff's claim. If the contract as now claimed had been preserved in some open manner at its making, and if the evidence were all clear that Parker, the plaintiff's intimate friend, had agreed to purchase plaintiff's cotton products as claimed, and if evidence other than plaintiff's showed that the acceptance was made at the time and in the manner claimed, still, because of the relation existing between plaintiff and defendant, and because of the intimate friendship of the general manager and the plaintiff, and especially because of the guaranty of 75 cents for cotton grown by plaintiff as a tenant, it would be the duty of the court, we think, to reject plaintiff's claim.

We do not intend to announce a rule forbidding an attorney to deal or trade with his client, but we do wish to be understood as holding that, when he does have business dealings with his client, it is incumbent upon him to show that he has acted in the utmost good faith and fairness; that he has paid adequate consideration; that he has kept his client informed as to all material facts and his legal rights,

and that he has taken no undue advantage, but has acted as he would if dealing with a stranger. *Townsend* v. *Shipley,* 29 Ariz. 96, 239 Pac. 787; *Hamilton* v. *Allen,* 86 Neb. 401, 28 L. R. A. (N. S.) 723, 125 N. W. 610; *Swaim* v. *Martin,* 158 Ark. 469, 251 S. W. 26.

We do not believe plaintiff has sustained the burden the law thus imposes, and therefore affirm the judgment of the lower court.

LOCKWOOD, C. J., and McALISTER, J., concur.